IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRIAN L. HILL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:11-CV-617-N(BH) |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251,* this case was automatically referred for determination of non-dispositive motions and issuance of findings, conclusions, and recommendations on dispositive motions. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed July 14, 2011 (doc. 19), and *Defendant's Motion for Summary Judgment*, filed August 15, 2011 (doc. 21). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED,** Defendant's motion should be **DENIED**, and the case should be **REMANDED** for reconsideration.

**I. BACKGROUND**[1]

**A.   Procedural History**

Plaintiff Brian L. Hill (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

income benefits under Title XVI of the Social Security Act. (R. at 19.) Plaintiff applied for supplemental security income benefits on August 14, 2006, alleging disability since August 20, 2001 due to mental impairments.[2] (R. at 166-68, 177.) His application was denied initially and upon reconsideration. (R. at 88-92, 95-97.) He timely requested a hearing before an Administrative Law Judge ("ALJ"), and personally appeared and testified at a hearing held on April 1, 2008. (R. at 53-69.) On May 13, 2008, the ALJ issued a decision finding Plaintiff not disabled. (R. at 75-82.) Plaintiff appealed, and the Appeals Council remanded the case back to the ALJ because a recording of the April 1, 2008 hearing could not be located, rendering the record incomplete. (R. at 84-85.) Plaintiff personally appeared and testified at the second hearing held on October 20, 2009. (R. at 24-52.) On November 25, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 12-19.) The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.    Factual History**

  **1.    Age, Education, and Work Experience**

Plaintiff was born on September 7, 1967. (R. at 28.) He finished the ninth grade and has no past relevant work history. (R. at 58.)

  **2.    Medical Evidence**

On June 4, 2003, Jody A. Rubenstein, Ph.D., conducted a clinical assessment of Plaintiff. (R. at 307-10.) His IQ test resulted in a verbal IQ score of 77, a performance IQ of 64, and a full scale IQ of 69. (R. at 309.) A wide range achievement test resulted in reading and spelling scores

---

[2] During the hearing before the ALJ, Plaintiff's counsel agreed to change the onset date to August 14, 2006. (R. at 28-29.)

equivalent to a sixth grade education and a math score equivalent to a fifth grade education. (*Id*.) Plaintiff reported that he could cook, dress himself, take care of his personal hygiene, and that he had a girlfriend, got along well with family members, and spent his time watching television, going to church, mowing the lawn, and sleeping. (R. at 301, 310.) Dr. Rubenstein found Plaintiff oriented times four with good remote memory and immediate recall. (R. at 308.) He found that Plaintiff provided appropriate responses for simple hypothetical situations, exhibited good persistence, and completed tasks within a reasonable amount of time. (R. at 310.) Dr. Rubenstein diagnosed Plaintiff as having mild mental retardation with intellectual limitations and assigned him a GAF score of 55. (*Id.*)

On January 21, 2004, Plaintiff went to Parkland hospital complaining of a cyst on the left side of his neck and hoarseness. (R. at 588.) Plaintiff was examined by Lynn P. Roppolo, M.D. (*Id*.) Dr. Roppolo opined that the cyst could be benign but that malignancy could not be excluded. (*Id*.) Dr. Roppolo recommended a follow up and referred Plaintiff to the ENT clinic. (*Id*.)

On January 4, 2005, Plaintiff went to Parkland again regarding the cyst on his neck and was examined by Richard A. Suss, M.D. (R. at 581-82.) Dr. Suss noted that the cyst was larger, stated that he could not exclude malignancy, and recommended a follow up. (R. at 582.) On January 13, 2005, Plaintiff underwent testing and the cyst was diagnosed as a branchial cleft cyst. (R. at 578.)

On March 31, 2005, Plaintiff underwent surgery at Parkland Hospital to remove the cyst, which had grown since his previous visit. (R. at 570.) John Truelson, M.D., reported that Plaintiff was placed under general anesthesia, and his cyst was removed from the surrounding tissue and submitted for frozen section. (*Id*.) Dr. Truelson noted that the frozen section revealed that the cyst was consistent with a branchial cleft, and that after the cyst was removed, the wound was irrigated, sutured, and a Jackson-Pratt drain was placed in the wound to provide drainage. (R. at 571, 573.)

Dr. Truelson opined that Plaintiff did not have any significant complications from the surgery and was transferred to the post-anesthesia care unit in stable condition and subsequently released. (R. at 572.)

On September 19, 2006, Plaintiff was examined by George Mount, Ph.D. (R. at 300-02.) Plaintiff reported that he was a "water head" child and that he had learning disabilities. (R at 300.) He also reported that he had neck surgery in March 2004 and had taken hydrocodone for pain, but was not currently on medication. (*Id.*) Plaintiff reported being able to care for his personal hygiene, fix his own meals, help with household chores, read the paper, use the bus, remember to take medications, watch TV, attend church, visit with friends, do grocery shopping, and pay bills. (R. at 301.) He stated that he attended school through the ninth grade, had attended special education classes, and had not been able to pass the GED test. (*Id.*) Dr. Mount noted that Plaintiff's remote memory was intact, but his more recent memory was not. (*Id.*) Dr. Mount diagnosed Plaintiff with depressive disorder NOS, mild mental retardation, hydrocephalic by history, and psychosocial stressors of educational/occupational problems, and assigned him a GAF score of 55. (R. at 302.)

On April 24, 2007, Plaintiff went to the hospital with flu-like symptoms of vomiting, coughing, runny nose, headache, and diarrhea. (R. at 623.) He stated that he was not being treated for depression or emotional problems. (*Id.*) He was diagnosed with gastric reflux and acute gastroenteritis, and prescribed Zofran for nausea. (R. at 561.)

On April 11, 2008, Plaintiff began receiving treatment at Dallas Metrocare for depression. (R. at 426-29, 493-98.) Plaintiff was seen by clinicians Susan Watson and George Biju, who diagnosed him with major depressive disorder, recurrent, moderate, borderline functioning, hydrocephalus, and assigned him a GAF score of 38. (R. at 426, 498.) Plaintiff reported depression, anxiety, insomnia, "feeling slowdown", poor focus and concentration, low energy and motivation,

irritability, low frustration tolerance alternating with periods where he would not get out of bed, and lots of mixed moods. (R. at 426.) He reported that his appetite and weight had decreased, and that he was not willing to engage in activities as before. (*Id.*) Biju noted that Plaintiff had a reduced ability to function in the community due to poor coping skills and isolation due to negative thoughts; that he had become withdrawn with moderate difficulties in interactions with others and the ability to maintain responsibilities during the past 90 days; and that his goal was to maintain mental stability. (R. at 426-27.) He opined that no employment would be likely without support as Plaintiff had not had regular employment in the past year. (*Id.*) Plaintiff was given a prescription for Trazadone and Celexa to treat his depression. (R. at 498.)

On March 11, 2009, Dr. Kazia Luczszynska opined that Plaintiff had major depressive disorder, recurrent, moderate. (R at 536-37.) Dr. Luczszynska noted that Plaintiff demonstrated psychomotor agitation/retardation, pressured speech, and anger outbursts, while receiving treatment. (R at 536.) She also noted that Plaintiff had a substantial loss of ability to cope with normal work stress and would miss approximately one day a month for work due to his condition. (R. at 536-37.)

On April 8, 2009, Plaintiff was seen by clinician Susan Watson at Metrocare. (R. at 508-09.) Plaintiff reported getting a rash that he believed resulted from taking old medications, and indicated he felt more alert and that the Trazadone was helping him sleep. (R. at 509.)

On July 8, 2009, Plaintiff was seen by clinician Karla Lucas at Metrocare. (R. at 516-17.) Plaintiff reported taking his medication and doing well. (R. at 516.) He rated his depression as 5 out of 10 and attributed it to the fact that he could not get social security income. (*Id.*) Lucas noted that Plaintiff's responses to questions seemed directed towards getting disability insurance, and he was given a prescription for his medication. (*Id.*)

On September 1, 2009, Plaintiff was again seen by clinician Karla Lucas at Metrocare. (R.

at 422.) Plaintiff indicated he was there to get assistance with obtaining food stamps. (*Id.*) Lucas noted that Plaintiff was sufficiently dressed and groomed, was oriented times four, and had a normal affect. (*Id.*) Plaintiff indicated that he would attend all scheduled appointments and be compliant with his medication in order to reduce his symptoms and his risk of harm. (*Id.*)

On September 23, 2009, Plaintiff was again seen by clinician George Biju at Metrocare. (R. at 490-93.) Plaintiff reported he had mild depression, mild sadness, mild anxiety, and slept 5-6 hours a night. (R. at 490.) Plaintiff also reported that his "mental" symptoms caused him difficulty with working and finding employment, and he had recent problems with getting into arguments with others (*Id.*) Biju noted that Plaintiff had some deterioration in relationships with others but was still able to maintain some meaningful relationships. (*Id.*) He also noted that Plaintiff was getting into more arguments, and that employment was not likely due to his history of unemployment over the last year. (*Id.*) Plaintiff also saw clinician Karla Lucas on the same day and indicated that he had been taking his medication, was sleeping well, had good appetite, and had an okay mood. (R. at 524.) Lucas noted that Plaintiff had below average intelligence, limited insight, was alert and cooperative, and had an "okay" mood. (R. at 522-24.) She also noted that his moderate mood disorder was in remission. (R. at 524.)

### 3. Hearing Testimony

On October 20, 2009, Plaintiff, two medical experts ("ME"), and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 20-21.) Plaintiff was represented by his attorney. (R. at 24.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he was born on September 7, 1967, and was 42 years old. (R. at 34.) He had no past relevant work and had spent two years in prison for violating his probation on a child

sexual assault conviction. (R. at 32, 41.) He had a neck tumor that was removed in 2005 and had not had any additional tumors. (R. at 31.) He was unsure if he had Hepatitis and was not receiving any treatment for it. (R. at 33.) He did suffer from bronchitis, however. (*Id.*)

Plaintiff testified that he had been receiving treatment at MHMR to help with his depression and sleep disorder. (R. at 34.) The medication made him sleepy but did not cause him to take naps during the day. (R. at 35.) His depression caused him to have suicidal thoughts and made him not want to do anything at all. (R. at 36.) He felt imbalanced or "lost in space," and would lose track of time or forget where he was going. (*Id.*) He was being treated for a rash that he believed was associated with his medication. (R. at 37.) He had not worked since his onset date. (*Id.*) He believed he had nerve damage in his neck following his surgery because there were times when he could not feel anything on one side of his neck, and at other times, it would stiffen up on him and take a while to relax. (R. at 37-38.)

Plaintiff stated that he applied for and received food stamps. (R. at 38.) On a typical day, he would go to the food pantry, grocery store, or do "things [he] need[ed] to do". (*Id.*) He also would sleep as much as he could. (R. at 39.) He would interact with others sometimes. (*Id.*) The interactions were sometimes difficult and at other times were "real good" depending on his mood. (*Id.*) He had mood swings and believed the medication he was taking for depression was supposed to help with them. (*Id.*) There were times that he would lose sleep, would not feel like eating, and would sometimes skip breakfast or lunch. (*Id.*) He spent time with others, including relatives that he visited. (R. at 40.) Plaintiff testified that he was not working because he did not feel like it, he got discouraged and would sometimes want to throw "stuff on the floor", and it was nerve-racking. (*Id.*) He had not been able to keep a job for very long because he would always get fired for doing something wrong. (*Id.*) Plaintiff testified that he weighed between 200 and 206 pounds. (R. at 41.)

b. *Medical Expert's Testimony*

### 1). Sterling Moore

Medical expert Sterling Moore testified that Plaintiff did not have any physical medically determinable impairments that were severe. (R. at 43.) He noted that Plaintiff had a benign cyst removed and that it was normal to have the small sensory nerves impacted in the tumor area or have some numbness at the incision site as a result of the surgery. (*Id.*) He testified that he was unable to find a record of Hepatitis B, and that there was no basis to believe that Plaintiff had Hepatitis based on his lab results. (*Id.*) According to him, Plaintiff's bronchitis, gastroesophageal reflux, and colitis, did not reach the severity or durational requirements to meet a listing, and he did not have any physical impairments that would impose more than minimal limitations. (*Id.*)

### 2). Alvin Smith

A second medical expert, Alvin Smith, testified that Plaintiff did not have a mental or emotional condition that met or equaled a listed impairment. (R. at 45.) Dr. Smith testified that Plaintiff was diagnosed with a major depressive disorder, recurrent, moderate by MHMR in April 2008 and placed on medication. (*Id.*) Plaintiff returned to MHMR with similar complaints almost a year later, in March 2009, and stated that he had not been on medication for 11 months. (*Id.*) According to Dr. Smith, it appeared that Plaintiff had not been taking the medication that he had been prescribed in April 2008. (*Id.*) During the March 2009 visit, Plaintiff was again placed on medication and by September 23, 2009, his condition was described as in remission. (R. at 46.)

Dr. Smith testified that Plaintiff had mental retardation based on Dr. Rubenstein's diagnosis in 2003 but functioned at the upper end of the mild and marked range, which was consistent with his 69 overall IQ score. (*Id.*) There was not much information about Plaintiff's medical history prior to age 22. (R. at 47.) There was evidence, however, indicating that he struggled in school and

with school work, which was consistent with cognitive and behavioral problems respectively. (*Id.*) Dr. Smith testified that Plaintiff did not have any other significant mental or physical impairment that could be combined with the mild mental retardation to meet the 12.05C listing. (*Id.*) The only limitation he would place on Plaintiff would be to limit him to unskilled work. (R. at 48.)

      c. *Vocational Expert's Testimony*

Donald Anderson, a vocational expert ("VE"), also testified at the hearing. (R. at 49-51.) He testified that Plaintiff had no past relevant work. (R. at 49.) The ALJ asked the VE to opine whether Plaintiff had any deficits in his ability to read and write at the sixth grade level. (*Id.*) The VE testified that Plaintiff's reading and spelling were at a sixth grade level and his math was at a fifth grade level. (*Id.*) The VE agreed with the ALJ that Plaintiff was not functional because he read at a sixth grade level. (*Id.*) The ALJ asked the VE to opine whether a 47-year-old person that was limited to unskilled work with no physical limitations and that had no past relevant work would be able to perform work activity that exists in significant numbers within the economy. (*Id.*) The VE stated that the hypothetical person could perform light unskilled work existing in significant numbers in the local and national economy such as a bottling line attendant, dishwasher silver wrapper, and street cleaner. (R. at 50-51.)  Plaintiff's attorney did not ask the VE any questions. (R. at 51.)

**C.**    **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on November 25, 2009. (R. at 12-19.) At step 1, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his application date of August 14, 2006. (R. at 14.) At step 2, he found that Plaintiff had the severe impairment of mental retardation. (*Id.*) At step 3, the ALJ determined that Plaintiff had no impairment, or combination of impairments, that met or equaled the requirements

of any listed impairment. (*Id*.) The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with the nonexertional limitations to do unskilled work. (R. at 17.) He found that Plaintiff had no past relevant work and no transferable skills, and that considering his age, education, work experienced, and RFC, he could perform jobs that existed in significant numbers in the national economy. (R. at 18.) The ALJ concluded that Plaintiff was not under a disability from August 14, 2006 through the date of the decision. (R. at 19.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

Case 3:11-cv-00617-N Document 23 Filed 12/30/11 Page 11 of 16 PageID 841

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work,

>other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, and in the alternative, to remand for further proceedings. (Pl. Br. at 15.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id*. at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells*

*v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.      Issues for Review**

Plaintiff argues that the disability determination was not supported by substantial evidence and was not made pursuant to a proper standard because:

1. The ALJ erred at Step 3 in finding that Plaintiff did not meet the listing for mental retardation;

2. The hypothetical question to the VE did not reasonably incorporate all disabilities of the Plaintiff recognized by the ALJ.

3. The ALJ erred by not considering the subsection 404.1527(d) factors before declining to give weight to the opinions of Plaintiff's treating specialist.

4. The ALJ erred in finding Plaintiff not credible.

(Pl. Br. at 1.)

**C.      Issue 1: *Stone* Standard**

While Plaintiff's first issue is framed as a step 3 issue, he makes arguments related to both steps 2 and 3 of the sequential evaluation process. (*See* Pl. Br. at 5-15.) He first argues that the ALJ erred at step 3 in finding that he did not meet the requirements of Listing 12.05C for mental retardation. (*Id.* at 5-9.) He next contends that the ALJ failed to utilize the proper severity standard set forth in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). (Pl. Br. at 10-12.) He argues that the ALJ cited to *Stone* and the correct standard of severity in his decision, but relied on medical expert testimony that was elicited in response to questions containing an incorrect definition of severity. (*Id.*) He finally contends that the ALJ failed to consider whether Plaintiff's other mental impairments were severe, and failed to consider whether his obesity was a severe impairment. (*Id.* at 12-15.) Since the *Stone* issue arises at Step 2 of the sequential evaluation process and is

dispositive of Plaintiff's motion, it is considered first.

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(C). The Fifth Circuit has held that a literal application of these regulations would be inconsistent with the Social Security Act because they include fewer conditions than indicated by the statute. *Stone*, 752 F.2d at 1104-05. Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(C) (1984) is used." *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at *6 (N.D. Tex. Aug. 29, 2001) (Boyle, Mag.). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

The ALJ's narrative discussion at step 2 explicitly cites to *Stone* and uses the correct standard of severity, describing a non-severe impairment as one that has "no interference with the

ability to work." (R. at 14.) In finding no severe physical impairments, the ALJ relied on the ME's testimony from the hearing that Plaintiff did not have any physically medically determinable impairments that were severe. (*Id.*) In the relevant exchange, the ALJ asked the ME to opine whether Plaintiff had "any physical limitations that would impose more than minimal limitations on the claimant", and the ME responded in the negative. (R. at 43.) The ME then went on to review several of Plaintiff's physical problems — including his cyst removal, the numbness in his neck, his bronchitis, his colitis, and his intestinal and gastroesophageal problems — and concluded that "these are things which would not reach the level of severity required." (R. at 43-45).

At the very least, the ALJ's construction of a severe impairment presented to the ME was incomplete because it described a severe impairment as an impairment that "impose[s] more than minimal limitations on the claimant." (R. at 43.) Under *Stone*, however, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." 752 F.2d at 1101. The ALJ's explicit reliance on the ME's testimony at step 2 creates an ambiguity as to whether the correct standard of severity was applied. Such an ambiguity must be resolved at the administrative level and precludes an immediate award of benefits.

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir.1989) (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, the ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error. The Fifth Circuit left the lower courts no discretion to determine whether such an error is harmless. Rather, the court mandated that "[u]nless the correct standard is used, the claim must be

remanded to the Secretary for reconsideration." *Stone*, 752 F.2d at 1106 (emphasis added). Because the ALJ applied an incorrect standard of severity at step 2, remand is required. Since remand is required for a step 2 error, the Court does not consider the remaining issues for review.

### III. RECOMMENDATION

Plaintiff's motion should be **GRANTED,** Defendant's motion should be **DENIED**, and the case should be **REMANDED** for reconsideration.

**SO RECOMMENDED**, **on this 30th day of December, 2011.**

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE